UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 06-60371-CIV-HUCK/SIMONTON

JANICE BURGOS,

      Plaintiff,

vs.

MICHAEL CHERTOFF, as Director of the
United States Department of Homeland
Security,

      Defendant.
_____/

## ORDER GRANTING SUMMARY JUDGMENT

THIS MATTER is before the Court upon Defendant's Motion for Summary Judgment [D.E. #15], filed on November 22, 2006. Because Burgos cannot, as a matter of law, prove any of her claims, Defendant's motion is granted.

**I.      Factual and Procedural Background**

Plaintiff, Janice Burgos ("Burgos")[1], is an employee of the United States Department of Homeland Security ("DHS" or the "agency"). Defendant, Michael Chertoff ("Chertoff"), is the Director of DHS, an agency of the federal government. Burgos has brought this action against Chertoff for unlawful disability discrimination, unlawful harassment, and unlawful retaliation, in violation of Sections 501 and 504(a)(1) of the Rehabilitation Act, 29 U.S.C. §§ 791 and 794a(a)(1) ("Rehabilitation Act").

In December 2001, while working as a Customs Inspector at the Foreign Mail Facility at the Port of Miami, Burgos suffered a right hand and wrist injury, diagnosed and treated as carpel tunnel

---

[1] Burgos was married at some point during this litigation and her name was changed to Janice Burgos Stefanelli.

syndrome, for which she filed and received workers' compensation benefits. In May 2002, while working as a Customs Inspector at the Port of Miami, Burgos suffered a second injury to her right hand and right shoulder while in the process of qualifying to use her handgun at the firing range. She again sought and obtained workers' compensation benefits. Her injuries were diagnosed as de Qervain's tenosynovitis in her right arm and bursitis in her right shoulder.[2] These injuries impaired Burgos's ability to lift objects, turn her body, and move and raise her arm. From June 2002 through October 2002, Burgos received physical therapy for her injuries. As a consequence of her injuries, Burgos had difficulty driving long distances. Holding the wheel and steering for the course of her 47-mile commute to work caused her pain and exacerbated her injuries.

In mid-October 2002, Burgos was reassigned from the Cargo Clearance Center in the Port of Miami to the Passenger Processing section at Miami International Airport. During this reassignment, Burgos bid for a 5:00 a.m. to 1:00 p.m. shift in order to avoid the rush hour commute. Instead, she received a shit from 8:00 a.m. to 4:00 p.m.[3] Upon inquiring why the decision was made, her supervisor replied that the decision was "what management has decided to do" and that it was out of his control. As a result of the extended daily commute, Burgos's shoulder pain worsened.

On April 7, 2003, Burgos submitted a memorandum to the Port Director, Jeffrey Baldwin ("Baldwin"), advising him of her condition and requesting a transfer to Ft. Lauderdale. Compl. Ex. A. Burgos attached to that memorandum the March 26, 2003 Medical Statement of Dr. Manuel

---

[2] In his deposition, Dr. Porth calls her injury "chronic shoulder strain with impingement." Porth Dep. at 14.

[3] In her Complaint, Burgos states that she was "unilaterally removed" from the earlier shift. It is unclear whether she initially received placement in the earlier shift and was then removed, or she was merely denied in her initial bid for the early shift. The distinction is ultimately immaterial.

Porth ("Porth").  His statement described her shoulder condition and recommended "to continue the limitation with respect to overhead work, heavy lifting and straining as well as repetitive type of activity" and strongly advised "that we limit the need to drive 47 miles one way to go to work and see if we can assist in relocating this patient to a job assignment that is closer to home."  After receiving no response, Burgos submitted a second memorandum to Baldwin on May 14, 2003.  Attached to that letter, she included another, more detailed report from Dr. Porth, dated May 7, 2003.  Finally, on May 29, 2003, Burgos sent an e-mail to Baldwin and Port supervisor Robert K. Rankin ("Rankin") that informed both recipients that she had not yet received a response to her prior missives.

Baldwin sent an e-mail reply to Burgos on May 29, 2003 apologizing for the delay and indicating that the request had been forwarded to the Miami Field Operations office for review, consideration, and response.[4]  By letter dated June 6, 2003, Baldwin replied to Burgos's April 7, 2003 letter by stating that DHS had not been provided with sufficient information upon which to base a decision on her request.  Compl., Ex. F.  He stated that, prior to any further consideration of her request, the agency would require comprehensive medical documentation from her physician that clearly demonstrates her current medical status.  In addition, Baldwin request that Dr. Porth provide comprehensive medical documentation to support both the request for limited driving and that showed Burgos still had the ability to carry and utilize an agency-issued firearm.  The letter included an enumeration of Burgos's position description and essential job duties.  Moreover, the letter included a specific list of information that should be included in Burgos's physician's report.  Finally,

---

[4] Burgos sent another e-mail to Baldwin inquiring as to whether he had received both letters, and thus had all the information necessary to make a determination.  Baldwin replied that he was not sure and asked Burgos to fax the materials, which she did.

the letter highlighted the fact that during the period of December 2001 through May 2003, Burgos voluntarily accepted 48 Sunday assignments, averaging an additional 3 Sunday commutes per month. Burgos asserts that she did not receive this letter until June 16, 2003 and that Dr. Porth did not receive it until August 2003.

On August 20, 2003, Dr. Porth responded to the June 6, 2003 correspondence with another assessment of Burgos's physical condition. Compl., Ex. I. In response to an August 7, 2003 letter from Baldwin, on September 20, 2003, Dr. Porth again reiterated his assessment of her condition to Baldwin.

On October 1, 2003, Burgos was informed that she would no longer be allowed to work as a replacement at the General Aviation Center. Because of this action, Burgos's union steward, Barbara J. Evans ("Evans"), sent a letter to Jan Jarrett ("Jarrett"), Chief of Passenger Processing section, demanding an explanation. After receiving no response from Jarrett, Evans sent a second letter, this time to Thomas Mattina ("Mattina"), Port Director for Passenger Processing at the airport, again requesting the reason for keeping Burgos from working at the Private Aircraft Facility at the General Aviation Center. By letter dated October 9, 2003, Jarrett responded to Evans's letter, stating that Burgos was not permanently assigned to the Private Aircraft Enforcement Team or to the General Aviation Center, but was merely temporarily assigned there as a replacement. Evans responded to this letter with a request as to why Burgos would no longer be considered as a replacement in the future. Jarrett never responded to this letter.

In October 2003, the Cargo Clearance Center requested six volunteers from the Passenger Processing section, where Burgos was assigned at the time. Burgos volunteered for the position because it would involve a shorter commute and less physical activity. After Rankin informed her that

4

she was selected, she submitted the necessary personnel transfer information requested by Senior Inspector Angel Acevedo of the Cargo Clearance Center. Although she was scheduled to report to her new position on December 1, 2003, Rankin informed her on November 26, 2003 that she would have to return to the Passenger Processing section. Rankin said that the decision was made by Baldwin and that no reason was given. Union steward Evans sent a letter on December 1, 2003 to Baldwin requesting an explanation for the withdrawal of the approval.

On December 2, 2003, Baldwin received a completed OWCP-5 form from Dr. Porth, detailing Burgos's condition and limitations. On December 3, 2003, Burgos contacted an Equal Employment Opportunity ("EEO") counselor. Some time thereafter, she was issued a notice of right to file a discrimination claim.

On December 4, 2003, Burgos observed a notice from Inspector J. Scott that the Cargo Clearance center was still accepting volunteers. However, after she faxed a letter expressing her interest to Thomas Chance ("Chance"), Chance indicated that the notice was incorrect and that the Cargo Clearance Center was not, in fact, requesting any more volunteers. On December 8, 2003, Baldwin sent a letter to Robert Murphy ("Murphy"), the President of Burgos's Union chapter, informing Murphy that Burgos had a pending medical request that was currently under review, making reassignment impossible until that request had been resolved.

Burgos, in a conversation with a Suzanne Gelber ("Gelber"), an employee in Baldwin's office, learned that Baldwin had requested that Gelber write a letter to Dr. Porth inquiring how many miles Burgos could drive. By e-mail dated December 12, 2003, Burgos informed Baldwin that Gelber had not, in fact, written such a letter and that the continuing delays were affecting her physically. On December 13, 2003, Baldwin responded that Dr. Porth had only advised against driving long

5

distances, and did not define what constituted a long distance. Gelber sent the letter to Dr. Porth on January 8, 2004. Burgos, on that same date, indicated that she still had not received such a letter. Also on January 8, 2004, Burgos submitted a formal request for reasonable accommodation to Nathaniel M. Norwood ("Norwood"), who, in turn, forwarded the request to the local EEO office. On January 14, 2004, Burgos filed her formal discrimination claim with the EEO.

On January 27, 2004, Baldwin issued a memorandum to all Legacy Customs Inspectors, Miami Service Port (which included Burgos), to submit a "rotation bid" preference worksheet for potential reassignment. Burgos submitted a bid to be reassigned to the Cargo Clearance Center, which would lessen her commute. Baldwin denied her bid without explanation.

After a March 3, 2004 mediation, Burgos and DHS signed a written settlement agreement. Burgos agreed to withdraw her EEO complaint and accept temporary reassignment to Port Everglades pending the final results of a Fitness for Duty Evaluation by the Public Health Service to take place no earlier than three months from February 23, 2004. In return, the agency agreed (1) that prior to reaching the final result on the Fitness for Duty Evaluation, the Public Health Service would consult with Burgos's physician for input; (2) to temporarily place Burgos on an 8 a.m. to 4 p.m. shift from Monday to Friday in Passenger Processing pending the results of the Public Health Service's evaluation; (3) to honor previously approved leave; and (4) to submit necessary medical documents to the Public Health physician. The Settlement Agreement stated that the Fitness for Duty exam was to be evaluated based on the Legacy Customs Inspector position description. Further, the agreement stated that, after consultation with Burgos's physician, a final determination as to whether reassignment would be temporary or permanent would be based on medical documentation from Public health Service. DHS was required to inform Burgos of the final decision within 60 days of the

receipt of the final medical report from the Public Health Service.

Chertoff asserts that on June 16, 2004, the Public Health Service, through Dr. Haviva Goldhagen ("Goldhagen"), sent a three-page letter to Dr. Porth which summarized her understanding of Burgos's condition based upon the documentation provided to her by the agency. She allegedly requested that Dr. Porth provide her information to assist her in making a more informed recommendation to the agency. Dr. Porth apparently never received the letter and so Dr. Goldhagen received no response. Dr. Goldhagen made no further efforts to contact Dr. Porth and issued her evaluation on September 9, 2004. In the evaluation, Dr. Goldhagen determined that Burgos was not medically fit for full duty as a Customs and Border Patrol Inspector and that Burgos be stripped of her arming authority. The agency then made a final determination that Burgos could not become permanent in her position at Port Everglades. She was ordered to turn in her firearm and was removed from her position. DHS offered to reassign her to her choice of one of three positions in Miami at her current GS-11 grade level at the Cargo Clearance Center, or, in the alternative, to assign her to an available position for which she qualified at a different grade level at any other preferred geographic location. Although she initially accepted one of the positions, she later withdrew her acceptance and has not accepted any other assignment.

Burgos asserts that DHS breached their settlement agreement for two reasons. First, DHS had Burgos undergo an improperly and unduly strenuous Fitness for Duty examination--not the Legacy Customs Inspector position for which she had been hired. Second, Public Health Service failed to consult with Dr. Porth for his input prior to reaching a final decision.

Burgos then, pursuant to the terms of the settlement agreement, reinstated her EEO claims. By decision dated December 19, 2005, the Equal Employment Opportunity Commission ("EEOC")

held that DHS had in fact breached the terms of the settlement agreement by failing to consult with Dr. Porth. Accordingly, Burgos's claims were allowed to proceed. Burgos had filed a second formal complaint of discrimination on December 30, 2004 and more than 180 days had passed since the filing of the complaint without a decision, thus permitting Burgos to bring this action.

## II.     Discussion

### A.     Standard of Review

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen,* 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex*, 477 U.S. at 322-23; *Allen,* 121 F.3d at 646.

While the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough. *Id.*; *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

As indicated above, Burgos has brought this action for (1) unlawful disability discrimination, (2) hostile work environment harassment, and (3) unlawful retaliation, in violation of Sections 501 and 504(a)(1) of the Rehabilitation Act.

**B.   Discrimination under the Rehabilitation Act**

Burgos's claim in Count I is that Chertoff violated the Rehabilitation Act by discriminating against her on the basis of her disability. The Rehabilitation Act prohibits federal agencies from discriminating in employment against otherwise qualified individuals with a disability. 29 U.S.C. § 791. To establish a prima facie case of discrimination under the Act, Burgos must show that (1) she has a disability; (2) she is otherwise qualified for the position; and (3) she was subjected to unlawful discrimination as the result of his disability. *Sutton v. Lader*, 185 F.3d 1203, 1207-08 (11th Cir. 1999) (citing *Gordon v. E. L. Hamm & Assocs.*, 100 F.3d 907, 910; *Severino v. North Fort Myers Fire Control Dist.*, 935 F.2d 1179, 1183 (11th Cir. 1991)).

In order to succeed in her claim that Chertoff violated the Rehabilitation Act, Burgos must first show that she was disabled within the meaning of the Act. The Rehabilitation Act incorporates the standards of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, including the definition of "disability." Under the ADA, a "disability" is "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12101(2). "Major life activities are enumerated by EEOC regulation as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Chenoweth v. Hillsborough County*, 250 F.3d 1328, 1329 (11th Cir. 2001) (quoting 29 C.F.R. § 1630.2(I) (2001)). "Substantially limited" means "unable to perform a major life activity that the average person in the

general population can perform;" or "significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity." *Toyota Mfg. Kentucky, Inc. v. Williams*, 534 U.S. 184, 195-96 (2002) (quoting 29 C.F.R. §1630.2(j) (2001)). Thus, in determining whether an individual is substantially limited in a major life activity, the Court considers "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." *Id.*

In this case, Burgos is unable to show that she suffers from a disability as defined in the Act. Burgos asserts that her shoulder injury is a "disability that limited one or more of her major life activities, including her ability to engage in manual tasks, such as lifting, turning her body, moving her arm, and raising her arm." Compl. ¶ 51. The testimony of Dr. Porth, Burgos's treating physician, refutes this assertion, however. He diagnoses her injury as "chronic shoulder strain with impingement" whose symptoms would include soreness and aching after driving long distances. Porth Dep. at 13, 18. When asked whether Burgos's injury would inhibit her from engaging in major life activities such as "walking, talking, seeing, hearing, speaking, breathing, caring for herself, performing manual tasks, doing anything other than driving that – that would be a major life activity," Dr. Porth replied, "No, she – she can do all those things." *Id.* at 13. Dr. Porth stated that while the injury was chronic, he could not state with certainty whether it was permanent. *Id.* at 18. Burgos was not a candidate for surgery because Dr. Porth believed that she could be comfortable if she merely cut back on her activity level. *Id.* at 14. Although Dr. Porth recommends against Burgos engaging in heavy or repetitive lifting or overhead work, he has indicated that she is capable of working. *Id.* at 27, 31.

10

Ultimately, the inability to drive long distances is the crux of Burgos's limitation due to her shoulder injury.[5] The Eleventh Circuit has not recognized driving as a major life activity. *Chenoweth*, 250 F.3d at 1329 (noting that "driving is not only absent from the [EEOC major life activities] list but is conspicuously different in character from the activities that are listed"). Although driving may be important, it cannot be sensibly included with the inability to see or to learn as a major life activity. *Id.* at 1330. Moreover, looking to her individual circumstances, Burgos's inability to drive long distances did not substantially limit her ability to work. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 483 (1999). Burgos produced no evidence that she was unable to do her job. Indeed, she continued to do so for quite some time while her requests for transfer were pending. Burgos did not even seek a different job, but merely a change in location. Thus, Burgos was not unable to work nor was she substantially limited in any other major life activity. Accordingly, she was not disabled within the meaning of the Rehabilitation Act. Because the Court has determined that Burgos was not disabled, it is unnecessary to determine whether Chertoff reasonably accommodated her disability.

### C. Hostile Work Environment

In Count II, Burgos claims that Chertoff's actions created a hostile work environment in violation of the Rehabilitation Act. In such a claim, Burgos has the burden of proving a hostile work environment. *Edwards v. Wallace Cmty. College*, 49 F.3d 1517, 1521 (11th Cir. 1995). To establish a prima facie case for a hostile work environment claim, Burgos must demonstrate that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on the protected characteristic; (4) the harassment was sufficiently severe or

---

[5] Dr. Porth indicated that Burgos was not unable to drive, but rather should avoid long distances of driving that could exacerbate her shoulder injury.

pervasive to alter the terms and conditions of employment and thus create a discriminatorily abusive work environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious liability. *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002). Burgos must present concrete evidence in the form of specific facts, not just conclusory allegations and assertions. *See Earley v. Champion Internat'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990).

In her complaint, Burgos states that Chertoff created both a subjectively and objectively hostile work environment by (1) his continuing failure to provide a reasonable accommodation; (2) his repeated delays in responding to her and her physician's requests for reasonable accommodation; (3) his willful and intentional breaches of the March 2004 settlement agreement; (4) his use of the settlement agreement as an excuse to deny Burgos overtime; (5) causing Burgos further physical injury to and exacerbation of her already known disability; and (6) forcing Burgos to take a position in Miami knowing that any such position would require her to further injure herself in contravention of her physician's explicit instructions and that resulted in her being placed on unpaid leave.

First, in his Motion for Summary Judgment, Chertoff claims that Burgos did not raise her claim of hostile work environment at the administrative level. Burgos, on the other hand, asserts that she did in fact so raise the claim. Exhaustion of administrative remedies is necessary in order to properly bring a claim under the Rehabilitation Act. *See, e.g., Rogers v. Bennett*, 873 F.2d 1387, 1391 (11th Cir. 1987). In her January 12, 2004 EEO complaint, Burgos stated that she wanted "to work in a hostile free environment." Evans Aff., Ex. A. at 6. Moreover, Burgos recounted substantially similar factual allegations in her EEO complaint. Accordingly, the Court finds that Burgos has properly exhausted her administrative remedies.

Nevertheless, Burgos's claim that she was subjected to a hostile work environment must be

denied because, as noted above, Burgos did not belong to a protected group. She is neither disabled, nor was she ever recognized as disabled by the agency. Burgos has advanced no other theory as to why she is a member of a protected group. Without satisfying this element, Burgos's claim that she was subjected to a hostile work environment may not proceed.

**D.     Retaliation**

Finally, in Count III Burgos alleges that Chertoff unlawfully retaliated against her for engaging in protected behavior. To establish a prima facie case of retaliation, Burgos must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was some causal relationship between the two events. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (Title VII context). "An adverse employment action is an ultimate decision such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.' " *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (Title VII context). "To establish a causal connection, a plaintiff must show that 'the decision-makers were aware of the protected conduct' and 'that the protected activity and the adverse employment action were not wholly unrelated.'" *Gupta*, 212 F.3d at 590 (internal citations omitted). Once the employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a nondiscriminatory or non-retaliatory reason for its treatment of the employee. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (Title VII context). If the employer presents a legitimate explanation for its actions, the burden then returns to the employee to show that the explanation is pretextual. *Id.*

In this case, Burgos has clearly engaged in statutorily protected behavior by filing her EEO

complaints (both in January and December of 2004) with the agency. Burgos alleges that numerous adverse actions were undertaken in retaliation for her complaint, contending that Chertoff (1) intentionally refused to allow her to work any overtime by removing her from the overtime roster in Ft. Lauderdale and (2) intentionally breached the settlement agreement.[6] A reasonable employee would have found those actions materially adverse. Burgos, however, also attempts to include in her retaliation facts that took place before Burgos filed her initial EEO complaint in January 2004. Delay in processing Burgos's request for a transfer, failure to assign her to the Cargo Clearance Center, or failure to allow her to work at the Private Aircraft Facility at the General Aviation Center all took place in 2003 and, therefore, could not have been performed in retaliation to such protected activity. Finally, Burgos has satisfied the final prong because the agency was certainly aware of her administrative complaint and its alleged adverse actions were not completely unrelated. Accordingly, Burgos has met her *prima facie* case of retaliation.

Thus, the burden shifts to Chertoff to show that the adverse actions were not in fact retaliatory. With respect to Burgos's claim that she was denied overtime in retaliation for her complaint, Chertoff states that she was only denied overtime in Ft. Lauderdale after she turned down an overtime assignment. Indeed, in her deposition, Burgos acknowledges that she had been working overtime, that she turned down the overtime assignment, and then was subsequently not considered for future overtime assignments. Burgos Dep. at 200-01. Burgos has submitted no evidence or argument that this explanation was merely pretextual. Accordingly, her first claim for retaliation

---

[6] In her Opposition to Defendant's Motion for Summary Judgment, Burgos makes a claim that Defendant retaliated against her by failing to process her FLAP award for 2005. This allegation is included in neither Burgos's Complaint nor in her administrative claims. Accordingly, the Court will not consider it.

cannot survive.

Burgos's second claim, that Chertoff breached the settlement agreement in retaliation for her complaint, is more complicated. The settlement agreement was presumably entered into by both parties in an effort to resolve Burgos's EEO complaint, by setting forth the procedures to ensure that her complaints were dealt with in a fair manner. It does not logically follow then that Chertoff would breach the settlement agreement--whose existence was premised on the EEO complaint--in retaliation for Burgos bringing that complaint. Assuming, as did the EEOC, that Chertoff did breach the settlement agreement by failing to adequately consult with Dr. Porth, the agreement itself provided procedures for Burgos to follow to reinstate her EEO claims, which she did. Thus, while the breach of the settlement agreement may have been adverse, it seems antithetical that it would be retaliatory. Even assuming that the breach could be considered retaliatory, Chertoff has adequately explained the process by which the alleged breach took place. Dr. Goldhagen, an independent physician of the Public Health Service, conducted the tests and made the recommendations for her firearm removal. Similarly, Chertoff has shown that an attempt--albeit an unsuccessful one--was made to consult with Dr. Porth. Although the process by which the agency handled Burgos's case may have been in conflict with the procedures set forth in the settlement agreement, Chertoff has set forth reasonable explanations for why they were not in fact retaliatory. Again, Burgos has proffered no evidence as to why she believes that Chertoff's explanations for the breach are merely pretextual. She has shown no evidence that the adverse actions were done in retaliation for her advancing her EEO complaint. Thus, her claim for retaliation must be dismissed.

**III.     Conclusion**

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

DONE AND ORDERED in Chambers, Miami, Florida, this January 9, 2007.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Honorable Andrea M. Simonton
All Counsel of Record